Filed 6/21/22  Cockren v. Brown CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| DUSTIN J. COCKREN, | F080282 |
| Plaintiff and Respondent, | (Super. Ct. No. BPB-16-002660) |
| v. | |
| BOB D. BROWN, as Cotrustee, etc. et al., | **OPINION** |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Kern County.  Robert S. Tafoya, Judge.

Dake, Braun & Monje, Craig N. Braun, for Defendants and Appellants.

Fennemore Dowling Aaron, Kenneth M. Byrum, Leigh W. Burnside, Daniel O. Jamison, and Justin L. Thomas, for Plaintiff and Respondent.

-ooOoo-

William Rommel amended and restated his existing trust in 2013. Rommel was in his 90s at the time, had a broken back, and died two weeks after he signed the amended trust. This case arose over whether Rommel included an oil lease and the oil rights underlying the lease, in the amended trust. Dustin Cockren, the petitioner below and respondent on appeal, initiated the instant matter against the two co-trustees of the trust, Bob Brown and Kelley Brown, seeking distribution of the oil lease and underlying oil rights, from the trust. The co-trustees argued in the probate court they could not transfer the oil lease or oil rights to Dustin Cockren because Rommel failed, before he died, to sign *separate* transfer documents (apart from the trust itself) to convey the legal title of his oil lease and oil rights to the trust. The probate court rejected the co-trustees' contentions and found in favor of Dustin Cockren. Among other remedies, the probate court ordered the co-trustees to execute a conveyance of Rommel's oil assets to themselves as trustees and distribute them to Dustin Cockren. The probate court further found the co-trustees acted in bad faith and surcharged them. Co-trustees appealed. We affirm the probate court in all respects.

## FACTS AND PROCEEDINGS

### A.      Rommel Trust Was Established in 2003

William J. Rommel established The William J. Rommel Revocable Trust via written instrument on October 8, 2003, with himself as the trustee. The 2003 Rommel trust was drafted by attorney Stephen Dake. On October 28, 2003, Rommel executed a Memorandum of Trust Instrument, indicating he had "conveyed all of his real property located in Kern County, and personal property[,] to the Trustee." The memorandum was recorded in the official records of the County of Kern on November 4, 2003.

### B.      Rommel Received Oil, Gas, and Mineral Interests in 2007, and Entered into a Lease Based on Those Interests in 2011

On October 2, 2007, Rommel received, via a quitclaim deed from Lucille Barkley, an interest in "oil, gas and minerals or other hydrocarbons in and under" a specific parcel

2.

of real property located in Kern County (oil interests or oil and gas interests or mineral interests or oil rights). On June 28, 2011, Lucille Barkley executed a "Correcting Quitclaim Deed" regarding the previously gifted oil interests; the corrected deed was recorded on July 7, 2011. The same day as the recordation of the corrected deed, Rommel entered into an oil, gas, other hydrocarbons and mineral lease (oil lease or oil and gas lease) with Compass Global Resources, LLC, based on his oil interests in the relevant property. The oil lease was recorded on April 10, 2012; the record does not contain documents specifying the lease term. The oil lease yielded monthly royalties in favor of Rommel in the form of a monthly check from the Termo Company (the record does not reveal the relationship between Compass Global Resources, LLC, and the Termo Company).

## C.  2003 Rommel Trust Was Amended and Restated in 2013

In April 2013, attorney Stephen Dake drafted, per Rommel's instruction, "The Amended and Restated William J. Rommel Revocable Trust Instrument" (amended trust), which amended the 2003 Rommel trust instrument. In this regard, Rommel gave Dake handwritten notes identifying assets to be distributed to specific beneficiaries pursuant to the terms of the amended trust. Dake prepared, and attached to the amended trust instrument, a list of these assets and the respective beneficiaries thereof; this list was entitled "Schedule 'A' " and subtitled "Specific Bequests." The amended trust instrument was signed by Rommel as settlor.

The amended trust instrument named as co-trustees, "William J. Rommel, Bob D. Brown and Kelley Brown," and specified that "each Trustee shall be vested with all the title, rights, powers, discretions, privileges, duties, and obligations of every other Trustee." (Art. Seven, §§ 7.02 & 7.06.) Among other things, the trustees were empowered to "hold property in the name of a nominee or in any other way without disclosing the trust relationship." (Art. Six, § 6.01, subd. (u).) Rommel signed the amended trust instrument as trustee; Bob Brown and Kelley Brown also signed the

3.

amended trust instrument as co-trustees, agreeing to serve in this capacity and to accept the obligations associated therewith.

Article One of the amended trust addressed property comprising the trust estate. Article One, section 1.01 provided: "Trust Estate. All property now held in or hereinafter transferred or assigned to the Trustee, to be held under the terms of one or more separate trusts, funds or shares created or otherwise provided for under the terms of this Amended Trust Instrument, shall constitute the 'Trust Estate' and shall be administered pursuant to the provisions of this Amended Trust Instrument." Article One, section 1.03 provided: "Title and Future Assignments. For purposes of beneficiary designations or transfers directly to the Trust, transfers shall be completed by vesting title in 'William J. Rommel, Bob D. Brown and Kelley Brown, Trustees under The William J. Rommel Revocable Trust dated October 8, 2003[,] as amended and restated on April 24, 2013."

Article Four of the amended trust instrument pertained to the "administration" of the trust at "death of settlor." (Unnecessary capitalization omitted.) Article Four, section 4.02 addressed the distribution of the property listed on Schedule "A" upon Rommel's death and provided: "Specific Distribution of Property. The real property or, as applicable, item or items of personal property identified on Schedule 'A' shall be distributed outright and free of trust to the designee specified in said Schedule."

There were 12 "Specific Bequests" listed on Schedule "A." For example, Specific Bequest No. 1 stated: "Dustin J. Cockren shall receive the real property located at 1525 Flower Street, Bakersfield, California, as well as all personal property located therein that is not otherwise required to be distributed to one or more devisees in the succeeding provisions of this Schedule." Specific Bequest No. 4 stated: "Kelley A. Brown shall receive Checking Account No. 4200XXXXXXX and CitiBank Savings Plus Account No. 4005XXXXXXX currently maintained at Citibank. In the event Kelly A. Brown should predecease me, these Accounts shall be distributed to Bob D. Brown." Specific Bequest

4.

No. 6 stated: "Kelley Brown shall receive Franklin California Tax Free Account No. 112-1121XXXXXXX. This bequest of the Franklin Account is made to Kelley Brown under the specific condition that all costs and expenses of administration of the Trust Estate are to be paid from this Account. In the event Kelley Brown has predeceased me, the Franklin Account shall be distributed in equal shares to Bob D. Brown, Brian D. Brown and Brent D. Brown, or to the survivor or survivors of Bob D. Brown, Brian D. Brown and Brent D. Brown subject to the same terms and conditions under which the Franklin Account is bequeathed to Kelley Brown."

Specific Bequest No. 8 stated: "Dustin J. Cockren and Nicole A. Adams shall each receive one-half of all shares of stock which the Estate holds in IBM, IDEARC and Chevron. In the event either Dustin J. Cockren or Nicole A. Adams should predecease me, his or her share of this bequest shall pass to the survivor." At issue in this case is Specific Bequest No. 9, which stated: "Nicole A. Cockren Adams shall receive all oil and gas leases held in the Trust. In the event Nicole A. Cockren Adams should predecease me, all oil and gas leases shall be distributed to Dustin J. Cockren."

When Rommel signed the amended trust, on April 24, 2013, he was in his 90s and unwell, and had broken his back. He required care and assistance at that time. On May 9, 2013, only 15 days after he signed the amended trust, Rommel passed away.

**D. Administration of the Amended Rommel Trust Following Rommel's Death**

The post-death administration of the amended Rommel Trust was largely handled by co-trustee Kelley Brown, who was the daughter-in-law of Bob Brown, the other co-trustee. In the months following Rommel's death, Kelley Brown made many of the distributions specified in Schedule "A" of the amended trust.

Dustin Cockren, the petitioner in this matter, and Nicole Adams, were siblings. Following Rommel's death, despite the specification in Schedule "A" of the amended trust that Nicole would receive Rommel's oil and gas leases and/or oil and gas interests, no distribution of any such assets was made to Nicole. Over three years passed with no

5.

distributions to Nicole. Nicole was not financially capable of taking legal action to enforce any rights she had in this regard ("She was living in a motel. She was broke, no money"). Therefore, Dustin purchased Nicole's potential rights under the amended trust for $5,000, in order to bring an action to enforce the same. Accordingly, in 2016, Nicole executed a written assignment of her interests to Dustin; she executed a corrected assignment in 2017. Dustin eventually filed the instant suit against Bob Brown and Kelley Brown. More specifically, he filed on January 18, 2018, under Probate Code section 850, a petition for a determination that Rommel's oil lease and underlying oil rights were assets of Rommel's amended trust and, under the terms of the trust, including Special Bequest No. 9 in Schedule "A," were required to be distributed to Dustin as Nicole's assignee. The matter proceeded to trial before the probate court.

E.      **Trial in the Probate Court**

A one-day trial took place on May 29, 2019, before Judge Robert Tafoya.

*(1)      Testimony of Dustin Cockren*

Dustin was the first witness called at trial, in his case in chief. Dustin was a welder by profession. Dustin's family came to know Rommel when they lived across the street from him in Bakersfield. Dustin's family became very close with Rommel, to the point that Rommel was present at the births of Dustin and Nicole. Rommel taught Dustin and Nicole to swim and ride bikes. He was present at all their birthdays and at Christmas, bringing them presents; he had "always been there." Dustin testified: "He was like my Godfather, grandpa-type." Dustin referred to Rommel as "grandpa" and Dustin's kids called Rommel "grandpa" as well. Nicole was close to Rommel too. Rommel had no children or family of his own and had outlived his siblings.

Dustin was asked, "How often did you talk to William Rommel within the last five years of his life?" Dustin responded: "We went to lunch every – we went to breakfast every weekend on Sunday – Sunday. We used to go Saturday and Sunday, but after you know when I got older and family and everything, we just moved it down to Sunday. So

6.

at least once a week you know, if I had any problems or anything and I needed to talk to somebody or ask him advice. So at least once a week."

Rommel would freely share information about his finances with Dustin. Rommel had worked as a bookkeeper for various farms and once owned part of a farm. His income included dividends from stocks he owned as well as checks he received for oil interests he had inherited from Lucille Barkley. Dustin understood from Rommel that Rommel's assets had a total value of approximately $900,000.

In addition to sharing his financial information with Dustin, Rommel made clear to Dustin that he intended to leave certain of his assets to Dustin and Nicole. Rommel specifically and repeatedly told Dustin that he intended to give Nicole his oil interests because Nicole was on a fixed income, and he wanted to help her. The oil interests were the subject of a lease that paid royalties, the amounts of which would vary in accordance with variations in the price of oil. Rommel did not want Nicole to be poor, living in motel rooms as she did; he wanted her to be able to afford a place to live. In these ongoing conversations with Dustin, Rommel did not draw any distinction between the oil interests and the lease of those interests that produced the royalty payments. Rather, he talked about his oil assets as a unified interest.

Rommel also explained to Dustin that he intended for his assets to be distributed via a trust and not a will. Rommel appreciated the difference and did not want his estate to go through probate; he wanted his assets to be distributed via a trust because he believed the process would be smoother and faster. Rommel further clarified that he intended for *all his assets* to be distributed through his trust.

Approximately two months after Rommel died, Dustin attempted to speak to co-trustees Bob Brown and Kelley Brown about the oil interests/oil lease royalty payments to be distributed to Nicole. Kelley told Dustin that she was waiting to pay attorney's fees first. Dustin replied that Rommel had left Kelley a specific bank account to cover the trust's administrative expenses, whereas the royalty payments were for Nicole. Specific

7.

Bequest No. 6 in Schedule "A" to the trust specified that expenses related to trust administration were to be paid from a Franklin account.

Thereafter, Dustin placed between 50 and 100 telephone calls to Bob Brown and Kelley Brown, trying to follow up on the issue of royalty payments for Nicole. He left multiple messages, including with Kelley's secretary, but no one ever called him back. On the one occasion he was able to speak to Bob, Bob told him the royalty checks were "probably little" because the price of oil was down. At no time did Bob or Kelley say that Nicole would not receive the royalty payments or assert that the oil rights or oil lease were not assets of the trust.

In October 2013, five months after Rommel's death, Bob and Kelley presented Dustin and Nicole with a Waiver of Accounting. Dustin and Nicole signed the waiver, which purported to waive "any accounting" by the co-trustees and "approve[d] the administration of the Trust." By that time, Bob and Kelley had asked Dustin for Nicole's address so they could send her the oil lease. Bob and Kelley told Dustin that Nicole would receive the lease. Dustin would not have signed the waiver had he known Nicole would never receive the lease.

Finally, Dustin and his counsel had the following exchange. Counsel asked Dustin: "Mr. Rommel specifically told you he took care of your sister in his trust by providing the oil lease, correct?" Dustin answered in the affirmative. Counsel next asked: "Okay. And he held that property – he said this property will go into my trust for her?" Dustin again answered in the affirmative. Counsel then asked: "And … you discussed this with him very recently prior to his death?" Dustin answered, "Yes."

### (2) Deposition Testimony of Bob Brown Admitted at Trial

Bob Brown did not appear at trial for medical reasons and the court allowed Dustin's counsel to read excerpts of Bob's deposition testimony into the trial record. Bob testified that he had known Rommel for 60 years; they were not good friends but rather "really good acquaintances." Bob explained that the *only* testamentary instrument

8.

created by Rommel to distribute his assets was the trust. Bob noted that Rommel intended to distribute *all his property* through the trust document. Bob also observed: "And … a lot of it is not happening the way … that [Rommel] said it would." Bob further explained: "[I]t's been dragging out for a long time and he didn't think it would."

Bob testified that Rommel had discussed his oil interests with Bob. Rommel also "showed [Bob] a check one time from the oil company that he got" for his "mineral rights." Rommel told Bob, "I get that every month, but it changes because the oil stock changes." Bob testified that the oil interests/oil leases were generating oil royalties. He noted it was his understanding that "eventually [the oil company] found out that [Rommel] passed away so they stopped [the royalties]."

Bob further confirmed, when questioned about Specific Bequest No. 9 in Schedule "A" to the trust, that Rommel had told him the mineral rights/oil leases were to be distributed to Nicole Adams. Bob added: "And why didn't that happen? I don't know. I don't know. You guys will have to tell me."

### (3)    *Testimony of Kelley Brown*

Kelley Brown testified that before Rommel passed away, he gave her the trust and explained what he wanted to happen based on the trust. Kelley understood the schedule of assets attached to the trust to include items that he wanted distributed to the specified beneficiaries. Kelley understood that all the listed items were assets of the trust because Rommel told her so and wanted the items to be part of the trust and distributed through the trust, and the bequests were in writing. Kelley further testified that attorney Dake had also explained that the items listed in Schedule "A" to the trust were assets of the trust. Kelley's personal reading of the trust instrument, as informed by her discussions with Rommel and attorney Dake, led her to understand that the property identified in Schedule "A" consisted of trust assets.

Rommel specifically told Kelley what he wanted to happen with his oil interests pursuant to the trust. Kelley was asked, "Mrs. Brown, isn't it true Mr. Rommel told you

9.

specifically that he wanted Nicole Adams to have his oil interest?" Kelley responded in the affirmative. Later in her testimony, Kelley testified that Rommel had actually referred to "[t]he oil and gas lease." Kelley reiterated that Rommel specifically told her the leases were to be distributed to Nicole.

Kelley confirmed the trust never transferred an oil and gas lease to Nicole. When she was asked why there was no such transfer, she responded: "Because I was told that there was no specification of what the oil and gas lease was[,] by [attorney Dake]."

Kelley acknowledged she collected the monthly royalty checks sent by the Termo Company to Rommel, approximately 30 checks, for three years, from mid-2013 to 2016. Kelley explained: "I made a request for a change of address for Mr. Rommel so that all his bills and correspondence from his home were coming to me." Thus, "Mr. Rommel's mail was coming to [Kelley's] P.O. Box," and she took the checks that came in the mail and deposited them in the Citibank account that Rommel had bequeathed to her via Specific Bequest No. 4 in Schedule "A" to the trust. Kelley testified she did not know what the checks were for, so she simply cashed them into the Citibank account (of which she was the beneficiary). Dustin's counsel pointed out that the checks contained language indicating they were sent directly to Kelley's P.O. Box. Kelley acknowledged that, while Rommel was alive, the checks were sent to his house, and further responded: "Then they changed it. I did not call the Termo Company."

Kelley initially denied that she disbursed, from the Citibank account, the royalty monies to herself. Dustin's counsel then read parts of Kelley's deposition into the record. In the deposition, Kelley stated she used the money in the Citibank account to pay trust expenses, including attorney's fees, but acknowledged that any remaining balance would have redounded to her as the beneficiary of the account. She further acknowledged there was nothing left in the Citibank account.

When Kelley resumed her trial testimony, she admitted that, under the terms of Specific Bequest No. 6 in Schedule "A" to the trust, she received Rommel's Franklin

10.

account on condition that all trust expenses were paid from *that account*. In other words, Kelley was not authorized to use any funds in the Citibank account for trust expenses. Moreover, Kelley indicated that her responsibilities as trustee were wrapped up by the end of 2013 (which reasonably would have precluded or limited subsequent trust administration expenses).

Kelley ultimately admitted she made distributions to herself from the Citibank account, *which distributions included the royalty payments she deposited into that account*. Kelly thus acknowledged that she made royalty payments to herself.[1]

### *(4)* *Testimony of Attorney Stephen Dake (Trial Counsel for Bob Brown and Kelley Brown)*

Attorney Stephen Dake, who represented Bob Brown and Kelley Brown in the probate court in the instant matter, testified at trial. Dake was the attorney who drafted the restated trust agreement. Dake testified that Rommel gave Dake "handwritten notes as to what property he wanted to go to particular people" and Dake prepared Schedule "A" based on Rommel's notes. In the course of drafting the restated trust instrument, Dake did not tell Rommel that execution of the instrument would be sufficient to transfer the oil interest and oil lease to the trust. At the same time, Dake acknowledged that Rommel *never* indicated the items listed on Schedule "A" were *not* part of the trust's assets; Dake did not recall Rommel talking about this issue when he signed the trust instrument.

Dake testified it was his understanding that for any particular property to be part of the trust, title to the property was required to be in the trust's name. This prompted Dustin's counsel to retort: "And so your understanding is contrary to current California

---

[1] At a different point in her testimony, Kelley made an inconsistent statement to the effect she deposited the checks in the Citibank account because "they were still in Mr. Rommel's name" and she "just assumed that once everything was handled that those checks would go to whoever they belonged to." Kelley also testified that attorney Dake told her to deposit the checks in the Citibank account.

11.

law?" Dustin's counsel further commented: "The point being the major issue with this case [is] you thought title had to be in the name of the trust not just that [Rommel] … specifically held the property out [to be] in trust." Dake reiterated that he believed that for particular property to be in trust, its title had to be in the name of the trust.

Dake testified he told Rommel that "in order to effectively transfer real estate, you have to do it by way of deed." Dustin's counsel asked Dake: "And if he thought otherwise or even if he did think that, but still thought he held it in trust, you wouldn't know that one way or another, right, you stated you don't remember?" Dake responded: "I'm not a mind reader. I don't know what he may have thought or may not have thought."

Dake also acknowledged that the amended trust instrument he drafted contained multiple errors. For example, Schedule "A" appeared to denote certain items were part of Rommel's estate when the items were in fact part of the trust. Dake characterized such errors as "typographical errors" and stated: "Well, since I was the one that prepared the trust, I would take responsibility for any typographical errors." Dustin's counsel asked Dake: "And earlier you mentioned the trust specifically states that the settlor had children and that … the primary purpose was to support the beneficiaries who are his children. [¶] … [¶] And did he have children?" Dake answered: "He did not. So that would have been an error on my part not to eliminate that section or that sentence."

F.    **The Probate Court's Ruling**

*(1)    Overview*

The trial court issued a detailed ruling on August 26, 2019. The court found that the oil lease and underlying oil interests or rights were assets of the 2013 amended Rommel trust. The court further found that co-trustees Bob Brown and Kelley Brown had failed to properly administer the trust and breached their fiduciary duties and acted in bad faith when Kelley Brown retained and cashed the royalty checks from the oil company. The court found that "[a]t a minimum, the Co-Trustees knew these proceeds

12.

did not belong to them yet they kept the funds anyway. This is bad faith plain and simple." The court determined, based on the evidence, that the misappropriated royalty payments totaled $26,449.94 and ordered the co-trustees to distribute this amount to Dustin.

The court analyzed whether the co-trustees were liable to Dustin under Probate Code section 859 for twice the value of the property recovered (i.e., the royalty payments they collected) in this action. The court found the co-trustees were so liable: "Since this Court finds the Co-Trustees acted in bad faith in taking the royalty checks without justification and forcing [Dustin] to spend substantial funds of money in attorney fees over a three year period to gain what was rightfully his, the Co-Trustees are liable for the penalty under Probate Code Section 859 in an amount equal to twice the value of those proceeds or $52,899.88." The court also determined the co-trustees were liable for Dustin's attorney's fees and directed Dustin to file a separate motion for fees.

### (2)     The Oil Lease and The Oil Interest

As noted, the probate court determined that Rommel's oil lease and oil interest were assets of his 2013 amended trust. The court explained its reasoning in depth, as excerpted here:

> "The creation of a trust requires compliance with Probate Code Sections 15200 and 15206. A trust created by Section 15200 does not need a separate deed to transfer real property. In this case, the Court finds there was compliance when the Settlor executed the Restated Trust because, by doing so, the Decedent became both the settlor and a trustee and had designated third party trustees, namely Bob and Kelly Brown, as required by statute. See Carne v. Worthington (2016) 246 Cal.App.4th 548, 557, Ukkestad v. RBS Asset Finance, Inc. (2015) 235 Cal.App.4th 156. Thus, when the Restated Trust was created and executed this court finds, by operation of law, the oil, gas and mineral interests became part of the Settlor's Restated Trust. Stated differently, the Restated Trust *is* what made the oil and gas interest trust property. As shown by the oil, gas and mineral rights deeds, the oil lease was tied to the mineral rights. The oil and gas lease generated the royalty payments. In fact, Co-Trustee Kelley Brown testified at trial that the Decedent told her he intended for his oil interest to be in the trust and given to Nicole Cockren. No other provision

of the Restated Trust discusses anything related to oil. No other donative document was ever produced that showed the Decedent accounted for his oil interest in any other way.

"This court takes the position that the Co-Trustees could have produced the written rough notes the Settlor gave to Mr. Dake to prepare the Restated Trust. This release could have revealed it was not the Settlor's intent to give the oil, gas and mineral interests to Nicole absent him conveying this asset by a separate deed. There was no privacy or privilege interest to assert concerning the disclosure of these notes and such records could have directly clarified any ambiguity or confusion regarding the Settlor's intent and consequently avoided this costly lawsuit. Evidence Code Sections 959, 960, 961 and 412. This was never done.

"This court is persuaded by the Petitioner's argument that when one considers the numerous drafting errors in the Restated Trust and Schedule A … [t]his Court can … reasonably assume … that Mr. Dake inadvertently failed to include language disposing of the Settlor's mineral rights.… [¶] … [¶] This court finds [some of Mr. Dake's testimony] evasive and too general in nature.… Does Mr. Dake have a reason to be evasive? Yes. He is very interested in the outcome of this case. He has a stake in how the court decides the question of the Settlor's intent regarding the disposition of the oil, gas and mineral interests. Based on the testimony of Co-Trustee Brown the royalty checks were being used in part to pay attorney fees. Was Mr. Dake and his law firm being paid fees from the royalty checks for work performed after November 2013? If so, for what? These alleged fees were apparently generated after November [2013] when the Settlor's estate had [already] been divided. In deciding the weight to be given Mr. Dake's testimony this Court relies on Evidence Code Sections 780 (a) (b) (c) (d) (f) and (j) in concluding … the failure to include language pertaining to the disposition of the mineral rights were errors made by counsel when drafting the Restated Trust. The overwhelming evidence reveals it was the Settlor's intent to dispose of the oil, gas and mineral interests in the same manner as the rest of his property. The evidence supports a finding that all of the Settlor's property is contained in Schedule A of the Restated Trust and that it was the Settlor's intent that the oil, gas and mineral rights were to be given to Nicole Cockren on his death, without delay. No one has claimed or offered evidence the Settlor wanted the oil, gas and mineral interests to go to someone other than Nicole. There has been no evidence to suggest he wanted his oil, gas and mineral interest to escheat to the state of California. The evidence clearly demonstrates the Settlor, fully aware of his pending death, arranged for the modification of his original trust to facilitate the distribution of all of his assets to those persons who most mattered in his life. Any other construction of these facts is implausible." (Italics added.)

14.

### (3)     *Bad Faith on the Part of Bob Brown and Kelley Brown*

As noted, the probate court further determined that co-trustees Bob Brown and Kelley Brown had failed to properly administer the trust and breached their fiduciary duties and acted in bad faith when Kelley Brown retained and cashed the royalty checks from the oil company.  The court explained its reasoning, as excerpted here:

> "Under Probate Code Section 16000, a trustee has a duty to administer the trust according to the trust instrument.  This duty requires the trustee to distribute trust assets to the beneficiaries as mandated by the trust document.  A co-trustee will be liable for acquiescing in, or concealing, the breach of another co-trustee.  A co-trustee therefore has the obligation to pursue actions against a breaching co-trustee.  Probate Code Section 16402(b)(1)(2)(3)(4).  If a court finds that a person has in bad faith wrongfully taken property belonging to the trust, the person shall be liable for twice the value of the property recovered by an action under this part.  Probate Code Section 859.  This Court finds, based on the findings above, that the Co-Trustees breached their fiduciary duties as trustees of the Restated Trust and acted in bad faith when Kelley Brown retained and cashed the royalty checks from Termo Oil.  Following the holding in Estate of Kraus (2010) 184 Cal.App.4th 10[3], once it has been determined that the Petitioner is entitled to recover property pursuant to Probate Code Section 850 and that the Co-Trustees had no right to retain the royalty checks[,] they became subject to the penalty provisions of Probate Code Section 859.  There has not been one iota of evidence presented by the Co-Trustees to justify their retention of these funds, whether in their capacity as co-trustees or in their individual capacities.  Kelley Brown testified the Settlor told her that he intended that the royalty checks be given to Nicole Cockren.  At a minimum, the Co-Trustees knew these proceeds did not belong to them yet they kept the funds anyway.  This is bad faith plain and simple.  The Co-Trustees had a fiduciary responsibility to distribute the Settlor's assets according to the Restated Trust.  See O'Day v. Superior Court (1941) 18 Cal.2d 540, 543.  If they had any doubt concerning how to dispose the royalty checks they received following the death of the Settlor they were obligated to exercise reasonable diligence in finding answers.  They did absolutely nothing.  The retention and expenditure of the royalty checks constitute a blatant breach of their fiduciary obligations owed to the Settlor and the intended beneficiaries and [they] must be held accountable.  Despite the fact Co-Trustee Bob Brown did not receive nor spend the royalty checks, he was aware of what Co-Trustee Kelley Brown was doing and chose to ignore her deceit.  He is equally responsible for the loss that resulted to the Petitioner."

15.

**I.** **The Oil and Gas Lease (Generating Royalty Payments) and Underlying Oil and Gas Interest or Rights**

Co-trustees Bob Brown and Kelley Brown challenge the probate court's conclusions that: (1) Rommel's oil and gas lease was an asset of his 2013 amended trust; (2) the term, oil and gas lease, as it appears in Schedule "A" to the amended trust, encompassed Rommel's underlying oil rights or interests as well; and (3) both the oil and gas lease and the oil rights or interests should have been distributed to Nicole via the trust. The co-trustees argue that Rommel failed to convey the oil and gas lease, as well as the underlying oil interests, to his trust and therefore there was no basis to distribute these assets to Nicole via the trust. We reject the co-trustees' contentions and affirm the probate court.

*A.* *Standard of Review*

The interpretation of a testamentary document presents a question of law for independent review when there is no conflict or question of credibility in the relevant extrinsic evidence. (*Johnson v. Greenelsh* (2009) 47 Cal.4th 598, 604; *Burch v. George* (1994) 7 Cal.4th 246, 254.) To the extent the probate court's decision rests on its findings of fact, however, those findings are reviewed for substantial evidence. (*Ike v. Doolittle* (1998) 61 Cal.App.4th 51, 87.) " 'Under the substantial evidence standard of review, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment." ' " (*Estate of Kampen* (2011) 201 Cal.App.4th 971, 992.)

### B. General Considerations

The probate court is a court of general jurisdiction (Prob. Code, § 800; *Estate of Young* (2008) 160 Cal.App.4th 62, 86), with broad equitable powers. (See, e.g., *Estate of Stanley* (1949) 34 Cal.2d 311, 319; *Estate of Bennett* (2008) 163 Cal.App.4th 1303, 1311-1312.) The probate court has jurisdiction to determine whether property is part of a decedent's estate or living trust. (*Estate of Heggstad* (1993) 16 Cal.App.4th 943, 951-952 (*Heggstad*); *Schwartz v. Labow* (2008) 164 Cal.App.4th 417, 427.) As discussed in *Heggstad*, *supra*, at page 952, "[t]he probate court has general subject matter jurisdiction over the decedent's property and as such, it is empowered to resolve competing claims over the title to and distribution of the decedent's property. ([Prob. Code,] § 7050, subd. (b); see, e.g., *Estate of Baglione* (1966) 65 Cal.2d 192, 196-197.)"

Furthermore, Probate Code section 850, subdivision (a)(3) permits an interested person to petition the court for an appropriate order in situations where (1) "the trustee is in possession of, or holds title to, real or personal property, and the property, or some interest, is claimed to belong to another"; or (2) "the trustee has a claim to real or personal property, title or possession of which is held by another." In other words, under this statute, the probate court is empowered to resolve competing claims over the title to and distribution of, a decedent's property. (*Estate of Kraus* (2010) 184 Cal.App.4th 103, 111, 114 ["The statutory scheme's 'evident purpose' is to carry out the decedent's intent and to prevent looting of estates."].) "The probate court may apply general equitable principles in fashioning remedies and granting relief." (*Id.* at p. 114.)

" 'It will not be questioned that justice and sound policy require that the estates of decedents be distributed to persons rightfully entitled thereto and that every concern and endeavor of a probate court should be to the accomplishment of that purpose.' " (*Estate of Kraus*, *supra*, 184 Cal.App.4th at p. 114; see *O'Day v. Superior Court* (1941) 18 Cal.2d 540, 543 ["the object of the probate and administration proceedings is to secure distribution to the persons entitled to share in the estate"].)

### C. Rommel Included His Oil and Gas Leases in the 2013 Trust When He Signed the Trust Instrument

#### (i) Applicable Law

The essential necessary elements of a valid trust are (1) a trust intent (Prob. Code, § 15201); (2) trust property (Prob. Code, § 15202); (3) trust purpose (Prob. Code, § 15203); and (4) a beneficiary (Prob. Code, § 15205). (See 13 Witkin, Summary of Cal. Law (11th ed. 2017) Trusts, § 33, p. 644.) The methods for creating a trust set forth in Probate Code section 15200 include the following two options: "(a) A declaration by the owner of property that the owner holds the property as trustee"; and "(b) A transfer of property by the owner during the owner's lifetime to another person as trustee."

Further, when a trust relates to real property, Probate Code section 15206, the applicable statute of frauds, generally requires a writing demonstrating that the real property is held in trust. Section 15206 provides: "A trust in relation to real property is not valid unless evidenced by one of the following methods: [¶] (a) By a written instrument signed by the trustee, or by the trustee's agent if authorized in writing to do so. [¶] (b) By a written instrument conveying the trust property signed by the settlor, or by the settlor's agent if authorized in writing to do so. [¶] (c) By operation of law." A leasehold interest in real property counts as real property. (Prob. Code, § 68.)

A formal deed or separate assignment is not required to create a trust in real property or to transfer a real property interest to a trust. Rather, as reflected in Probate Code section 15200 (see above), "[t]he settlor can manifest his intention to create a trust in his property either by: (a) declaring himself trustee of the property or (b) transferring the property to another as trustee for some other person, by deed or *other inter vivos transfer* or by will." (*Heggstad*, *supra*, 16 Cal.App.4th at 948, italics added.)

*Heggstad* clarified, with reference to Probate Code section 15200, subdivision (a), that where the settlor is trustee and the trust property is real estate, a written document declaring a trust in the property, signed by the settlor, "constitutes a proper manifestation of his intent to create a trust.… [T]here is no requirement that the settlor/trustee execute

18.

a separate writing conveying the property to the trust." (*Heggstad*, *supra*, 16 Cal.App.4th at pp. 948, 950.)  The settlor thus need not execute a separate deed transferring legal title to himself as trustee:  "[A] written declaration of trust by the owner of real property, in which he names himself as trustee, is sufficient to create a trust in that property, and … the law does not require a separate deed transferring the property to the trust." (*Id*. at p. 950.)  Accordingly, there is no need for a separate "conveyance of title to the settlor as trustee."[2]  (*Id*. at pp. 950-951.)

Similarly, where a settlor creates a trust under Probate Code section 15200, subdivision (b), by a lifetime transfer of property to another person as trustee, a separate deed is *not* required to accomplish a transfer of property to the trust.  (*Carne v. Worthington* (2016) 246 Cal.App.4th 548, 559 (*Carne*).)  *Carne* pointed out, "[a]s the *Restatement Third of Trusts*, *section 16* notes, 'formalities prescribed for the creation of a recordable document, or otherwise for protection of or from third parties, need not be satisfied in order to make a valid donative transfer, that is, one that is effective as between the transferor and the transferee(s).' " (*Carne*, *supra*, at pp. 560-561, quoting Rest.3d Trusts, § 16, com. b, p. 229; cf. *Heggstad*, *supra*, 16 Cal.App.4th at p. 950 & fn. 7 [stating that written declaration is sufficient to create a trust in property but warning, "We hasten to note, however, that to be effective as to strangers, the declaration of trust must be recorded."].)

The Restatement Third of Trusts, section 16, comment b, discusses the circumstances under which property is effectively transferred from a settlor or trustor to a

---

**2**     *Heggstad* explained that when the grantor is the trustee, "there is not in fact a transfer of legal title to the property, since he already has legal title to it." (*Heggstad*, *supra*, 16 Cal.App.4th at pp. 948-949, emphasis omitted.)  The court reasoned: " '[T]here is no real transfer of any property interest to a trustee.  The settlor holds a property interest before the trust declaration, and after the declaration he holds a bare legal interest in the same property interest with the equitable or beneficial interest in the beneficiary.  No new property interest has passed to the trustee.  The settlor has merely remained the owner of part of what he formerly owned.' " (*Id*. at pp. 949-950.)

19.

third-party trustee via the trust agreement itself, without the execution of a separate deed or assignment: "Good practice certainly calls for the use of additional formalities and the taking of appropriate further steps, such as changes of registration, or the execution and recordation of deeds to land. Nevertheless, a writing signed by the settlor, or a trust agreement signed by the settlor and trustee, manifesting the settlor's present intention thereby to transfer specified property (such as all property listed on an attached schedule) is sufficient to create a trust." (Rest.3d Trusts, § 16, com. b, pp. 229-230.)

In light of the guidance encompassed in the Restatement Third of Trusts, the *Carne* court found the settlor there had accomplished the transfer of real property to a third-party trustee without executing a separate grant deed because the settlor identified the subject property in a schedule of assets attached to the trust instrument. He also referenced the asset schedule in the body of the trust. *Carne* found this was sufficient to deem the subject real property an asset of the trust; the settlor's signature on the trust was " 'sufficient to convey good title' " to the trust (which was also signed by the trustees). (*Carne*, *supra*, 246 Cal.App.4th at pp. 551, 564; see also *Ukkestad v. RBS Asset Finance, Inc.* (2015) 235 Cal.App.4th 156, 163-164 [finding decedent's trust instrument was sufficient to meet the requirement of the statute of frauds and no separate deed was required to transfer two pieces of real property to the settlor's trust].)

### (ii) Analysis

Here, the evidence admitted at trial showed that Rommel satisfied the requirements for including his oil and gas leases in the amended and restated trust he signed on April 24, 2013. A separate deed, assignment, or other transfer document was not necessary.

Preliminarily, we note there was no dispute that Rommel intended to create a trust and named himself one of the trustees. All the witnesses—Dustin, Bob Brown, Kelley Brown, and attorney Dake—testified that Rommel intended to dispose of his assets via a trust and not through a will. Rommel believed the disposing of his assets through a trust

20.

represented the fastest and most streamlined option. He named himself one of the trustees in the recitals at the beginning of the trust instrument, and further down, nominated Bob Brown and Kelley Brown as co-trustees. All three of them signed the trust as trustees.

Next, there is no dispute that Rommel was competent at the time he executed the amended and restated trust. Attorney Dake testified he met with Rommel in person, they discussed the terms of the amended trust, and Rommel provided Dake with handwritten notes to use in the preparation of the trust instrument. Likewise, there is no dispute regarding Rommel's capacity when he signed the trust.

It is also beyond dispute that Rommel intended the oil and gas leases to be part of the trust. Dustin, Bob Brown, Kelley Brown, and Dake all testified to Rommel's explicit directives, mere weeks before his impending death, that his oil and gas leases were to be distributed via the trust to Nicole (Bob and Kelley admit in their briefing that Rommel intended for Nicole to receive his oil and gas leases). Based on these instructions from Rommel, attorney Dake prepared Schedule "A" to the trust instrument, and Schedule "A" specifically identified "all oil and gas leases" and directed that Nicole was to receive them.

Rommel's intent that his trust would and did encompass, pursuant to its own terms, all the assets listed on Schedule "A," is reflected in Article One, section 1.01 of the trust instrument (Article One pertains to the "Trust Estate"). (Unnecessary capitalization omitted.) Article One, section 1:01 provided: "1.01. Trust Estate. *All property now held in or hereinafter* [that is, further on in this document] transferred or assigned to the Trustee, to be held under the terms of one or more separate trusts, funds or shares *created or otherwise provided for under the terms of this Amended Trust Instrument*, *shall constitute the 'Trust Estate'* and shall be administered pursuant to the provisions of this Amended Trust Instrument." (Italics added.) And at Article Four, section 4.02 (Administration at Death of Settlor) of the trust, Rommel provided, in part: "4:02.

21.

Specific Distribution of Property.  *The real property* or, as applicable, item or items of personal property identified on Schedule 'A' shall be distributed outright and *free of trust* to the designee specified in said Schedule."  (Italics added and unnecessary capitalization omitted.)  Schedule "A" was part of the trust document, and, as noted above, Schedule "A" specified that *Nicole was to receive all oil and gas leases*.  We conclude, the provisions of the trust instrument effectuated Rommel's intent to include his oil and gas leases in his trust.[3]

Notably, Rommel did not mandate that the trustees hold legal title to the property of the trust; in fact, Rommel expressly authorized the trustees to hold property in the name of a nominee.  At Article Six, section 6.01, subparagraph (u), Rommel stated the trustees were vested with the power and right "[t]o hold trust property in the name of a nominee or in any other way without disclosing the trust relationship."

Bob and Kelley contend they properly did not distribute the oil lease to Nicole as the lease was not "in the trust."  They highlight the fact that attorney Dake explained to Rommel that the oil and gas lease had to be assigned to the trust pursuant to a written document.  To the extent Bob and Kelley posit that for the oil and lease to be in the trust, Rommel had to execute another written document, separate and apart from the trust instrument, the contention has no merit.  As discussed above, so long as the trust instrument reflects the settlor's intent to hold the subject property in trust, the trust document is sufficient to render the property a trust asset.  Since the trust instrument

---

[3]    The co-trustees' reliance on Article One, section 1.03 of the trust is unavailing as that provision expressly refers to "Future Assignments."  With respect to *future assignments*, this provision provides:  "For purposes of beneficiary designations or transfers directly to the Trust, transfers shall be completed by vesting title in 'William J. Rommel, Bob D. Brown and Kelley Brown, Trustees under The William J. Rommel Revocable Trust dated October 8, 2003 as amended and restated on April 24, 2013.'"  The oil and gas leases, however, were not future assignments; rather, they were included in the trust *at the time Rommel signed the trust*.

effected the inclusion of the oil and gas leases in the trust, the applicable statute of frauds was also satisfied.

We conclude the trial court correctly ruled that Rommel's oil and gas leases were assets of the amended and restated trust and should have been distributed to Nicole—or later, to Dustin, as her assignee—pursuant to Specific Bequest No. 9 of Schedule "A" to the trust.

### D.      *Rommel's Underlying Oil Interests Were Also Encompassed in His Trust*

Although Special Bequest No. 9 in Schedule "A" of the trust uses the word "leases," the trial court correctly held that, with respect to his bequest to Nicole, Rommel intended the term to encompass his underlying oil interests as well. The trial court thus construed the trust to the effect that Rommel's gift to Nicole encompassed the oil interests, too. We affirm the trial court's determination.

#### (i)      <u>Applicable Law</u>

A single set of statutory rules set forth in Probate Code sections 21101 through 21140, governs the interpretation and construction of the whole range of estate planning instruments, including wills and trusts. In construing the terms of a trust instrument, the court's primary concern is to determine the intent of the settlor. (Prob. Code, § 21102, subd. (a); *Title Ins. & Trust Co. v. Duffill* (1923) 191 Cal. 629, 642 ["In seeking the true construction of a declaration of trust, the guiding principle must be the intention of the settlor—his intention as expressed. Not, What did he intend to say? But, What did he intend by what he did say? must be the test."].) Courts construe the trust instrument liberally to effectuate the apparent intention of the settlor. (*In re Estate of Heywood* (1905) 148 Cal. 184, 188.)

Further, courts give preference to an interpretation of a testamentary document that will *prevent* intestacy or failure of a transfer, over one that will *result in* intestacy or failure of a transfer. (Prob. Code, § 21120.) This rule applies to partial as well as total intestacies, and the fact that an instrument was made at all raises a presumption that the

testator intended to dispose of all his property as opposed to only some of it. (*Estate of Verdisson* (1992) 4 Cal.App.4th 1127, 1137.)

In addition, Probate Code section 21102, subdivision (c) states: "Nothing in this section limits the use of extrinsic evidence, to the extent otherwise authorized by law, to determine the intention of the transferor." The Law Revision Commission's "comment" as to Probate Code section 21102 explains that subdivision (c) was added to the statute "to make clear the admissibility of extrinsic evidence" for purposes of determining the transferor's intent as expressed in the instrument. (Rules of Construction for Trusts and Other Instruments (Nov. 2001) 31 Cal. Law Revision Com. Rep. (2001) 167, 192.)

Similarly, the statute of frauds does not categorically preclude the use of extrinsic evidence. " ' "The primary purpose of the Statute [of Frauds] is evidentiary, to require reliable evidence of the existence and terms of the contract and to prevent enforcement through fraud or perjury of contracts never in fact made." ' " (*Estate of Duke* (2015) 61 Cal.4th 871, 889 (*Duke*).) "Once sufficient written evidence of an agreement is presented, the evidentiary purpose is served, and extrinsic evidence is admissible to clarify ambiguous terms and to reform the writing to correct a mistake, even when the writing is intended to be a complete and exclusive statement of the parties' agreement." (*Ibid.*) Similarly, for purposes of the statute of frauds with respect to trusts in real property, the writing in question must describe the real property so that it can be identified with reasonable certainty; but a description fulfills the test of reasonable certainty if it furnishes the "means or key" by which the property may be identified, with or without recourse to extrinsic evidence. (*Beverage v. Canton Placer Mining Co.* (1955) 43 Cal.2d 769, 774; *Ganiats Construction, Inc. v. Hesse* (1960) 180 Cal.App.2d 377, 384.)

Moreover, in *Duke*, *supra*, 61 Cal.4th at p. 879, our Supreme Court explained that admission of extrinsic evidence is permitted to correct errors in donative documents such as trusts, and to identify and resolve ambiguities in donative instruments. (*Duke*, *supra*,

61 Cal.4th at pp. 887, 888.)  The court may thus inquire into what the instrument was intended to mean.  (Civ. Code, § 3401; Prob. Code, § 21102, subd. (c); *Ike v. Doolittle*, *supra*, (1998) 61 Cal.App.4th 51, 73 [" 'In interpreting a document such as a trust, it is proper for the trial court … to consider the circumstances under which the document was made so that the court may be placed in the position of the testator or trustor whose language it is interpreting, in order to determine whether the terms of the document are clear and definite, or ambiguous in some respect.' "].)  "An ambiguity in a written instrument exists when, *in light of the circumstances surrounding the execution of the instrument*, the ' "written language is fairly susceptible of two or more constructions." ' "  (*Ike v. Doolittle*, at p. 74, italics added.)

Duke further held that "myriad circumstances exist in which California courts appropriately admit evidence to establish a testator's intentions." (*Duke*, *supra*, 61 Cal.4th at pp. 888-889.)  When a trust instrument contains some expression of the settlor's intent, which is ambiguous on account of a drafting error (albeit facially unambiguous), the court may consider extrinsic evidence, including the testimony of the lawyer who drafted the instrument, to resolve the ambiguity and give effect to the settlor's expressed intent. (*Lissauer v. Union Bank and Trust Co*. (1941) 45 Cal.App.2d 468, 472-473; see *Ike v. Doolittle*, *supra*, 61 Cal.App.4th at p. 74.)  Extrinsic evidence is therefore admissible to show actual intent. (*Ike v. Doolittle*, *supra*, at p. 73.)  The trial court applies the clear and convincing standard of evidence when reforming, pursuant to its equitable powers, an ambiguous trust instrument to conform to the settlor's intent, in light of relevant extrinsic evidence. (*Id*. at pp. 69-71, 80.)

In short, "extrinsic evidence as to the circumstances under which a written instrument was made is admissible to interpret the instrument, although not to give it a meaning to which it is not reasonably susceptible." (*Ike v. Doolittle*, *supra*, 61 Cal.App.4th at p. 73.)  " 'It is the intention of the trustor, not the trustor's lawyer, which is the focus of the court's inquiry.' " (*Id*. at pp. 73-74.)  On review of the trial court's

25.

interpretation of a document, the appellate court's proper function is to give effect to the intention of the maker of the document. (*Ibid*.; *Siegel v. Fife* (2015) 234 Cal.App.4th 988, 996 [when the evidence is undisputed and the parties draw conflicting inferences, the court will independently draw inferences].)

Pursuant to their broad equitable powers, probate courts may also consider extrinsic evidence to correct a mistake in the expression of a testator's intent in an *unambiguous* instrument. (*Duke*, *supra*, 61 Cal.4th at p. 879; see *Wilkin v. Nelson* (2020) 45 Cal.App.5th 802, 809-810 [reformation "involves the exercise of the court's equitable powers"].) As indicated above, the probate court has authority to reform a testamentary instrument when clear and convincing evidence supports the equitable reformation of the document to conform to the testator's intent. Thus, our Supreme Court held in *Duke*, "an *unambiguous* will may be reformed to conform to the testator's intent if clear and convincing evidence establishes that the will contains a mistake in the testator's expression of intent at the time the will was drafted, and also establishes the testator's actual specific intent at the time the will was drafted." (*Duke*, *supra*, 61 Cal.4th at p. 898, italics added.)

*Duke* explained: "In cases in which clear and convincing evidence establishes both a mistake in the drafting of the will and the testator's actual and specific intent at the time the will was drafted, it is plain that denying reformation would defeat the testator's intent and result in unjust enrichment of unintended beneficiaries." (*Duke*, *supra*, 61 Cal.4th at p. 890 ["the paramount concern in construing a will is to determine the subjective intent of the testator"]; see *Placencia v. Strazicich* (2019) 42 Cal.App.5th 730, 741 ["the modern trend [is] toward favoring the decedent's intent over formalities"]; *Morgan v. Superior Court* (2018) 23 Cal.App.5th 1026, 1039 [the testator's intent is "the all controlling factor"].) Furthermore, "no policy underlying the statute of wills supports a rule that would ignore the testator's intent and unjustly enrich those who would inherit

26.

as a result of a mistake." (*Duke*, *supra*, 61 Cal.4th at p. 896; see *Wilkin v. Nelson*, *supra*, 45 Cal.App.5th at pp. 810-811 (citing *Duke*).)

### (ii)    Analysis

Here, the evidence presented at trial represented an echo chamber in which multiple witnesses emphasized that Rommel consistently and repeatedly spoke of his desire and intent to gift the entirety of his oil interests to Nicole. Rommel specifically and repeatedly told Dustin that he intended to give Nicole his oil interests because Nicole was on a fixed income, without a place to live, and he wanted to help her. Rommel also specifically told Dustin the trust he wrote would give his oil interest to Nicole. In the ongoing conversations with Dustin, Rommel did not draw any distinction between the oil interests and the lease of those interests that produced the royalty payments; rather, he talked about his oil assets as a unified interest. Just prior to his death, Rommel again told Dustin that his oil assets were in his trust for Nicole.

Kelley Brown testified that Rommel told her he was bequeathing his oil interests and oil leases to Nicole. Bob Brown confirmed, when questioned about Specific Bequest No. 9 in Schedule "A" to the trust, that Rommel had told him his mineral rights/oil leases were to be distributed to Nicole Adams. Specifically, when Bob was asked whether he understood from Rommel that Rommel's mineral rights and oil leases were to go to Nicole, he answered: "Nicole, yeah. That's what he, [Rommel], told me about the mineral rights." Rommel's attorney, Dake, testified that he did not discuss any separate gift of the oil rights to any beneficiary, when he met with Rommel to discuss amendment of Rommel's original trust to include a bequest of his oil assets. There was no evidence Dake asked Rommel whether Rommel had a different plan for disposition of the oil rights or explained to Rommel that a bequest of the oil rights could or should be addressed separately from the bequest of the oil leases that generated income in the form of monthly royalty checks; Dake never raised the issue.

Further, Bob Brown and Kelley Brown presented no evidence that Rommel understood, for the purpose of post-death distribution, that the oil rights and oil lease were separate and distinct items of property. As the probate court noted in its ruling, Rommel was not an " 'oil man.' " He had spent his career working as a bookkeeper for farmers, only inheriting the oil interests from a friend in 2011 when he was approximately 90 years old.[4]

Additionally, there is no dispute that Rommel intended to use the trust to dispose of *all* his assets. Dustin testified that Rommel told him he wanted all his property disposed of via his trust. Dustin further opined, based on his ongoing conversations with Rommel, that Rommel had in fact included all his property in his trust. Bob Brown testified that Rommel intended to distribute all his assets through his trust. Kelley Brown testified she understood that all the items listed in Schedule "A" were assets of the trust because Rommel told her so. Bob Brown further testified that the trust was the only testamentary instrument prepared by Rommel to distribute his assets. Bob Brown and Kelley Brown presented no evidence that Rommel intended to bequeath the oil interest to someone else, or that he intended to make a lifetime transfer of the interests to some other person or by some other instrument. On the contrary, the only evidence presented was that he intended the interests—and the royalty payments they gave rise to—to be distributed to Nicole after he died. Dustin testified Rommel wanted to help Nicole, he wanted her to be able to afford a place to live.

Finally, there is no dispute that the trust contained a number of drafting errors. These errors were addressed during the testimony of attorney Dake, who acknowledged that the trust document contained multiple errors, including denoting that the settlor desired to benefit beneficiaries who were primarily his children, when Rommel had no

---

[4]     The record shows that Lucille Barkley executed a correcting quitclaim deed in favor of Rommel in June 2011 (the correcting quitclaim deed corrected a quitclaim deed from 2007). Thus, at best, Rommel inherited the oil interests at issue in 2007, when he was in his 80s.

children.  Schedule "A" itself contained multiple errors, with several references to Rommel's "Estate," rather than to his trust.

Given the evidence that (1) Rommel intended the trust to dispose of all his assets; (2) Rommel meant for Nicole to receive his oil interest; (3) Dake acknowledged that he never flagged for Rommel the point that the oil interests should be addressed separately from the lease; and (4) the trust contained multiple drafting errors, the trial court correctly determined there was clear and convincing evidence to the effect that Rommel intended Specific Bequest No. 9 in Schedule "A" to the trust, i.e., the bequest of "all oil and gas leases held in the Trust," to include both the oil lease and the underlying oil interests or rights.

## II.     Probate Court's Ruling that Co-Trustees, Bob Brown and Kelley Brown, Acted in Bad Faith

The co-trustees challenge the probate court's findings that they breached their fiduciary duties as trustees of the amended trust and acted in bad faith when Kelley Brown retained and cashed the royalty checks sent to Rommel by Termo Oil.  We reject the co-trustees' contentions and affirm the probate court.

### A.     *The Co-Trustees were not Entitled to Keep and Spend the Royalty Payments Received After Rommel's Death*

A trustee has a duty to administer the trust according to the trust instrument. (Prob. Code, § 16000.)  This duty requires the trustee to distribute trust assets to the beneficiaries as mandated by the trust document.  Further, a trustee has a fiduciary duty to take, keep control of, and preserve trust property, as well as a duty to take reasonable steps to enforce claims that relate to trust property.  (Prob. Code, §§ 16006, 16010.)  If the trustee is aware of property that belongs to the trust, but title to or possession of the property is held by another, the trustee has a duty to attempt to recover the property. (Prob. Code, § 16006, 16010.)  A trustee who fails to bring a claim to recover trust property is in breach of his or her obligations and is subject to an action for surcharge. (*Purdy v. Johnson* (1917) 174 Cal. 521, 529.)

29.

Here, Kelley's trial and deposition testimony showed she deposited the oil royalties into Rommel's Citibank account, made distributions to herself from that account (including proceeds from the royalty checks), and the account had nothing left in it thereafter. The co-trustees were not entitled to keep and spend the royalty payments sent to Rommel after he died in May 2013. First, Schedule "A' of the trust expressly provides that the lease that generated the payments was to be distributed to Nicole – there is no language in the trust document to the effect that the lease or royalty payments were to be distributed to the co-trustees or anyone else.

Second, Special Bequest No. 6 of Schedule "A" specifies that "all costs and expenses of administration of the Trust Estate" were to be paid from the Franklin account that was bequeathed to Kelley (on this condition). Dustin reminded Kelley of this fact when she told him she was using the royalty payments to pay attorney's fees.

The co-trustees contend that the lease was not a trust asset and therefore they cannot be faulted for failing to distribute it and the attendant royalty payments to Nicole. However, if the co-trustees did not consider the lease a trust asset, they had no fiduciary authority over the funds that came from the lease, no beneficial interest in the funds, and therefore no right to the spend the money on anything, including trust administration expenses. They also had no right to deposit the royalty checks into the Citibank account specifically bequeathed to Kelley in Schedule "A" and then distribute the money to Kelley, which is what they did.

### B. The Co-Trustees Acted in Bad Faith in Distributing the Royalty Funds to Kelley Brown

Probate Code section 850 provides that any interested person may request the court to order a conveyance or transfer of property under specified circumstances, including where the decedent died in possession of, or holding title to, real or personal property, and the property or some interest therein is claimed to belong to another. Probate Code section 856, in turn, grants the probate court the power not only to order a

30.

conveyance or transfer of the property in question to the person entitled thereto, but also to grant other appropriate relief.

Where a trustee is deemed to have acted in bad faith, Probate Code section 859 provides for recovery of twice the value of property taken by the trustee. (*Hill v. Superior Court* (2016) 244 Cal.App.4th 1281, 1290 (*Hill*).) "The [Probate Code] section 859 penalty is imposed when an interested party establishes both that the property in question is recoverable under section 850 and that there was a bad faith taking of the property." (*Ibid.*)

A showing of bad faith under Probate Code section 859 does not require a showing of malice. (*Hill*, *supra*, 244 Cal.App.4th at p. 1287.) *Hill* noted that " 'bad faith' can be many different things, depending on the context." (*Ibid.*) *Hill* analogized the concept of bad faith under Probate Code section 859 to bad faith in agency law, under which an agent acts in bad faith when he enters into a contract on behalf of the principal without having a good faith basis to believe he had the authority to do so. (*Id.* at p. 1288.)

Other courts have found bad faith when a party acted "unreasonably or without proper cause." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347, italics omitted.) Bad faith may " 'consist of inaction,' " including " 'lack of diligence and slacking off.' " (*R.J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589, 1602.)

In the instant case, the trial record discloses substantial evidence of bad faith, inaction, and unreasonable conduct on the part of the co-trustees. The co-trustees admitted that Rommel told them the royalty payments were to be distributed to Nicole. Bob Brown admitted that Rommel had shown him one of the royalty checks he received on a monthly basis. Bob knew the royalty checks came every month, that they were sent by the oil company, and that the oil company stopped sending the checks upon eventually

discovering that Rommel had passed away. Bob also testified that once the checks ceased, the Citibank account ran empty.

Kelly Brown testified she understood the assets listed in Schedule "A" of the trust, were in the trust, and that the beneficiaries identified in the trust were to receive "certain things." Kelley further testified that Rommel specifically told her what he wanted to happen with his oil interest via the trust. She also testified that Rommel gave her a copy of a check stub which she knew as related to Specific Bequest No. 9 (the oil and gas leases) of Schedule "A." Kelley admitted receiving the royalty checks until 2016. She indicated the administration of the trust concluded in 2013 but she continued to receive, deposit, and distribute to herself the monthly royalty checks, until 2016, some 30 checks. She stated she deposited the checks into Rommel's Citibank account, paid bills, and distributed the balance of the funds to herself.

In addition, Kelley recalled the checks were from the Termo Company and were made out to Rommel, individually. Although she claimed not to know what the checks were for, Kelley admitted she never investigated the basis for the checks, the reason why the Termo Company was sending a check every month, or the nature of the Termo Company. Yet the royalty checks issued after Rommel's death identified the name and address of the oil company, "The Termo Company," and also mentioned the words "oil" and "lease" on the remittance statement. Moreover, the co-trustees did not refute Dustin's testimony that he made 50 to 100 phone calls to them after Rommel died to ask them about the royalty payments that all concerned understood Rommel had left to Nicole.

After Dustin initiated the present case, the court ordered the co-trustees to file an accounting with the court. Kelley testified that the accounting prepared on her behalf showed she made distributions to herself from the Citibank account into which she deposited the royalty payments. The co-trustees' accounting showed they collected royalty payments totaling $21, 266.01 from July 2013 through December 2015. During

this period, they distributed $30,200 to Kelley from the Citibank account. The co-trustees also admitted to paying trust administrative expenses from the Citibank account, notwithstanding the trust's explicit instruction that all administrative expenses were to be paid out of the Franklin account.

Dustin argues the evidence shows the co-trustees "readily conceded their own malfeasance. They knew what the royalty checks were for, they knew they had no claim to them and yet they distributed the money to [co-trustee] Kelley Brown who, under either side's theory of the case, had no right to the funds." Dustin also argues: "[The co-trustees'] bad faith was further demonstrated by their conduct in the litigation. [Co-trustee] Kelley Brown refused to appear for her deposition. She failed to produce the documents requested of her during the discovery phase. [Co-trustee] Bob Brown did the same and, ultimately, Dustin was required to bring a motion to compel both [the co-trustees'] attendance at deposition and their production of documents, which the court granted." Dustin further contends: "[The co-trustees] also failed to produce an accounting ordered by the court, and the court had to order them, again, to account for their administration of Mr. Rommel's trust." Dustin's contentions are well taken.

At trial, Kelley suggested that her actions in relation to the trust and the royalty payments were approved by attorney Dake. This deflection of responsibility does not assist the co-trustees. Article Seven, section 7.25 of the trust instrument makes clear that the co-trustees may hire professionals to assist them, but that the co-trustees can nevertheless be held liable for the acts of a delegee or employed professional if the trustee made the delegation, or employed the professional, in bad faith, or the trustee is considered "grossly negligent or such action constitutes willful misconduct, or the Trustee had actual knowledge of facts which might reasonably be expected to put the Trustee on notice of such acts or omissions."

Here, the co-trustees knew from Rommel himself that he intended the royalty payments to go to Nicole. The co-trustees also knew the royalty payments were not

33.

gifted to either of them; Rommel bequeathed other assets to them in Schedule "A." Furthermore, the co-trustees knew that all administrative expenses of the trust were to be paid out of the Franklin account. Nowhere in the trust was any discretion or authority granted to the co-trustees to use the royalty payments for administrative expenses or to distribute any part of the payments to either one of them. Moreover, neither co-trustee testified that attorney Dake authorized them to distribute the royalty payments to Kelley. Co-trustees therefore had knowledge of ample facts that placed them on notice that Dake's advice was incorrect, they had no right to use the royalty payments to pay administrative expenses, and they had no right to distribute any part of the royalty funds to Kelley.

The co-trustees' argument that they could not have acted in bad faith because they lacked title to the lease is unavailing. The lack of title in their names did not prevent the co-trustees from exercising complete control over the royalty payments generated by the lease: every month for nearly three years, they deposited the royalty checks, which were payable to Rommel, into the Citibank account, distributed the royalty funds to Kelley, and paid trust administrative expenses out of the account. The co-trustees offered no explanation why they simply did not write checks to Nicole and, later, to Dustin, for the amount of the royalty payments. The co-trustees also offered no explanation why they did not file a petition under Probate Code section 850 or 17200 to confirm record title to the oil and gas lease was held by them, as co-trustees, so they could then transfer title to Nicole.

Probate Code section 859 states that if a court finds that a person has in bad faith "wrongfully taken, concealed, or disposed of property belonging to a … trust, or the estate of a decedent … the person *shall* be liable for twice the value of the property recovered by an action under this part." (Italics added.) As noted, the Probate Code section 859 penalty is imposed when an interested party establishes both that the property in question is recoverable under Probate Code section 850 and that there was a bad faith

34.

taking of the property.  (*Estate of Kraus*, *supra*, 184 Cal.App.4th at p. 112.)  "[E]vidence of a defendant's financial status is not essential to the imposition of the statutory penalties, and financial inability to pay is a matter to be raised in mitigation."  (*Id.* at p. 118.)

Here, based on the evidence presented, including the co-trustees' own accounting, as well as the record of payments made by the Termo Company, the trial court determined the total amount of the misappropriated royalty payments and found such amount was recoverable under Probate Code section 850.  The trial court further found the co-trustees had acted in bad faith.  The court therefore had authority under Probate Code section 859 to impose double damages.  The judgment for double damages under Probate Code section 859 is affirmed.

## III.    Miscellaneous Issues

As for the remaining issues raised by Bob Brown and Kelley Brown, we find no merit to them and need not further address them.

**DISPOSITION**

The judgment is affirmed.  Dustin Cockren is awarded costs on appeal.


                                                                          SMITH, J.

WE CONCUR:


HILL, P. J.


FRANSON, J.


35.
